| | |
|---|---|
| 62 | 626 |
| 65 | 50 |
| 65 | 402 |
| 62 | 626 |
| 69 | 522 |
| 69 | 539 |
| 62 | 626 |
| 85 | 255 |
| 62 | 626 |
| 89 | 106 |
| 62 | 626 |
| 98 | 639 |
| 62 | 626 |
| 102 | 236 |
| 62 | 626 |
| 114 | 168 |
| 62 | 626 |
| 122 | 555 |
| 62 | 626 |
| 127 | 591 |
| 127 | 592 |
| 127 | 599 |

## William L. Webber, Trustee, v. The Pere Marquette Boom Company.

*Patent—Of land owned by the government and subject to sale—Objections to its validity, exclusively between it and patentee—Generally unassailable in action at law—Operates to pass the title—And raises conclusive presumption of compliance with all preliminary requirements—May be impeached collaterally in any action when it appears that the law did not provide for sale of land, or that land had been reserved from sale, or dedicated to special purpose, or previously transferred to others—Ejectment—Defendant in possession—Plaintiff must recover on strength of his own title—Survey of islands omitted from former government surveys—Order of commissioner for, to be valid, an island must have been so omitted—And land not previously conveyed by United States—Land covered by water not such an island—Riparian owner—Of land bordering on inland lakes or streams in Michigan—Owns to middle of same—This has become a rule of property—U. S. Supreme Court allows each State to determine this question for itself—Such rights not affected by ordinance of 1787—Or acts admitting Michigan into the Union.*

1. Where an act of Congress provided for the "issuing of scrip in legal subdivisions," which shall entitle the holder to "patents for an *equal* quantity of the *unoccupied* and *unappropriated* lands of the United States not mineral," and a patent was issued for scrip covering lots five and six of a given section, containing forty and 57-100 acres of land,—

   *Held,* in an action of ejectment involving the title so granted, that if the land belonged to the government and was subject to sale, an objection that the patent was *void* for *excess* was one *exclusively* between the government and the patentee, in which *third* parties are in no way concerned.

2. In ejectment, when the defendant is in possession, the plaintiff must recover, if at all, upon the strength of his *own* title.

3. It has been the practice for the commissioner of the general land office, upon proper application and deposit, to order a survey of such islands as were omitted from former surveys of the adjacent lands, under an act of Congress approved May 30, 1862, which surveys, when made, subjected the lands embraced therein to the general land laws and regulations. Pursuant to this practice a survey was made, in 1883, of a portion of a section of land covered by water, but not navigable for vessels, where, except in well-defined channels, vegetation, consisting of wild rice, grass, and rushes, grew up in the summer season through the water, but the whole tract was covered at all seasons with water from several inches to several feet in depth, underneath which was a deposit of mud.

*Held,* that in order to give the commissioner jurisdiction to order such survey there must have been an island omitted from the original survey, and the land must *not* have been *previously* conveyed by the United States.

*Held,* further, that to call the territory covered by said 1883 survey an island was a palpable misnomer, and that the United States parted with its title to said land when it conveyed the lots bordering upon this body of water.

4. It is the *settled* law in Michigan that the *title* of the riparian owner extends to the *middle* line of the *inland* waters, which rule has become one of property, and the United States Supreme Court recognizes the right of each state to determine the doctrine for itself.

5. United States patents are in general unassailable in an action at law. They not only operate to pass the *title,* but carry with them a *conclusive* presumption that *all* requirements preliminary to their issue have been complied with. But such a patent may be impeached *collaterally* in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the *law* did not provide for selling them, or that they had been *reserved* from sale, or dedicated to *special* purposes, or previously transferred to others.

6. The rights of riparian owners are nowhere mentioned in the ordinance of 1787, or in the acts admitting Michigan into the Union, the same being left to be settled according to State law.[1] How. Stat. p. 29, art. 4; *Moore v. Sanborne,* 2 Mich. 519; *Benjamin v. Manistee River Imp. Co.,* 42 Id. 628.

Error to Mason. (Judkins, J.) Argued June 10 and 11, 1886. Decided October 7, 1886.

Ejectment. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Wisner & Draper* (*W. L. Webber,* of counsel), for appellant:

If in fact the original survey and map were erroneous, the government was not estopped from surveying and disposing of the lands between such line and the bank of the stream: *Lammers v. Nissen,* 4 Neb. 245.

If, between the meander line and the bank of a river, there is at the time a body of swamp or waste lands or flats on which timber and grass grow, then the patents for the lands surveyed would not cover this land: *Granger v. Swart,* 1 Woolworth, C. C. 91.

[1]See *Burroughs v. Whitwam,* 59 Mich. 279 (head-note 3).

Where it appears that at the time of the original survey there was a tract of low land within the limits of what was shown on the original map as a lake, the physical facts must control :. *Hardin v. Jordan*, 16 Fed. Rep. 823.

*Ramsdell & Benedict*, for defendant :

"Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter, but the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be and remain public highways:" *St. P. & P. E. R. Co. v. Schurmeier*, 7 Wall. 272.

Courts of equity will set aside patents in favor of the equitable owner, where frauds have been practiced or mistakes of law have been made, and will review the findings of the land department on questions of fact: *Ross v. Doe*, 1 Pet. 655; *Lindsey v. Hawes*, 2 Black, 554; *Barnard v. Ashley*, 18 How. 43; *Cunningham v. Ashley*, 14 Id. 377.

If the *locus* in dispute never was land, there would seem to be no reason why the patent should not be held void in any court: *State v. Batchelder*, 1 Wall. 109.

The jurisdictional fact that there was no land to be surveyed or to be patented by the United States; consequently no valid survey could be made and no valid patent issue,—is admitted: *Polk's Lessee v. Wendal*, 9 Cranch, 87.

There are cases in which a grant is absolutely void, as where the State has no title to the thing granted, or where the officer has no authority to issue the grant: *Polk's Lessee v. Wendell*, 5 Wheat. 293; *Doe v. Winn*, 11 Id. 380.

If a patent is absolutely void upon its face, or the issuing thereof was without authority or was prohibited by statute, or the State had no title, it may be impeached collaterally, in a court of law, in an action of ejectment: *Hannibal & St. J. R. R. Co. v. Smith*, 9 Wall. 95; *Johnson v. Towsley*, 13 Id. 81.

This is one of those cases where the contest was about land owned by the United States, and the land office had jurisdiction to act: *French v. Fyan*, 93 U. S. 169.

When a tribunal is appointed to determine a question of fact preliminary to the issue of a patent for property which the land office is authorized to convey, the conclusions of that tribunal are conclusive as to the legal title: *Smelting Co. v. Kemp*, 104 U. S. 636.

The objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act: *Steel v. Smelting Co.*, 106 U. S. 447.

If they never were property of the United States, or if no legislation authorized their sale, or if they had been previously disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action: *Ehrhardt v. Hogaboom*, 115 U. S. 67.

If there was no jurisdiction in the land office to act, the decision and action of the land office is just as open to attack in one court as in another: *United States v. Lee*, 106 U. S. 196.

The United States has wisely abstained from extending its surveys and grants beyond the limits of high water of navigable rivers: *Barney v. Keokuk*, 94 U. S. 338; *St. Paul & P. R. R. Co. v. Schurmeier*, 7 Wall. 272.

When the Revolution took place, the people of each state became sovereign, and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the constitution to the general government: *Martin v. Waddell*, 16 Pet. 411; *Pollard v. Hagan*, 3 How. 212; *Genesee Chief v. Fitzhugh*, 12 How. 443.

Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several states themselves to determine: *Barney v. Keokuk*, 94 U. S. 324.

"The act of Congress providing for the admission of Missouri into the Union, and which declares that the Mississippi river shall be 'a common highway and forever free,' has been referred to in the argument here, but the rights of riparian owners are nowhere mentioned in the act. They are left to be settled according to the principles of state law:" *St. Louis v. Myers*, 113 U. S. 566.

The following states adhere to the doctrine that the beds of all rivers above the ebb and flow of the tide belong to the riparian owner: *Lorman v. Benson*, 8 Mich. 18; *Rice v. Ruddiman*, 10 Id. 125; *Ryan v. Brown*, 18 Id. 196; *Bay City Gas Light Co. v. Industrial Works*, 28 Id. 182; *Maxwell v. Bay City Bridge Co.*, 41 Id. 453; *Pere Marquette Boom Co. v. Adams*, 44 Id. 403; *Jones v. Pettibone*, 2 Wis. 308; *Mariner v. Schulte*, 13 Id. 693; *Olson v. Merrill*, 42 Id. 204; *Delaplaine v. Chicago & N. W. Ry. Co.*, Id.

214; *Gough v. Bell*, 1 Zab. (N. J. Law) 160; S. C. 2 Id.
455; *Bell v. Gough*, 3 Id. 656; *Townsend v. Brown*, 4 Id.
87; *Steamboat "Magnolia" v. Marshall*, 39 Miss. 109;
*Gavit v. Chambers*, 3 Ohio, 496; *Benner's Lessee v. Platter*,
6 Id. 505; *Blanchard v. Porter*, 11 Id. 138; *Walker v.
Board of Public Works*, 16 Id. 540; *Storer v. Freeman*, 6
Mass. 435; *Ingraham v. Wilkinson*, 4 Pick. 268; *Young
v. Harrison*, 6 Ga. 141; *Adams v. Pease*, 2 Conn. 481; *City
of Chicago v. Laflin*, 49 Ill. 177; *Braxon v. Bressler*, 64 Id.
488; *Granger v. Avery*, 64 Me. 292.

In the following states the *State* is held to be the owner of
the beds of rivers practicably navigable above tide water :
*McManus v. Carmichael*, 3 Iowa, 1; *Tomlin v. Dubuque,
etc., Ry. Co.*, 32 Id. 106; *People v. Canal Appraisers*, 33
N. Y. 461; *Carson v. Blazer*, 2 Binn. (Penn.) 475.

In the case of rivers which are navigable for vessels engaged
in foreign and interstate commerce,—as the Mississippi below
the Falls of St. Anthony; Grand River, Michigan, below
Grand Rapids (*The Daniel Ball*, 10 Wall. 557; *The Mon-
tello*, 11 Id. 411),—in a majority of the states, the title to
the bed of the river belongs to the riparian owner.

Courts of the United States will concede the title to the
riparian owner wherever it is conceded by the supreme court
of the commonwealth in which the controversy arises : *Bar-
ney v. Keokuk*, 94 U. S. 324; *Pere Marquette Boom Co. v.
Adams*, 44 Mich. 403; *St. Louis v. Myers*, 113 U. S. 566.

Rights of wharfage and boomage, increase by alluvion and
reliction, where that increase is imperceptible, are rights
which belong to the ownership of the bank, and are the same
whether the bed of the river belongs to the riparian owner
or to the commonwealth : *Banks v. Ogden*, 2 Wall. 57;
*St. Clair Co. v. Lovingston*, 23 Id. 46; *Delaplaine v. Chi-
cago & N. W. Ry. Co.*, 42 Wis. 214; *Diedrich v. N. W. U.
Ry. Co.*, Id. 248.

In those states where the bed of navigable streams is con-
ceded to the riparian owner, it would belong to the riparian
owner. In no case would it belong to the United States :
Ang. Watercourses, chap. 2; Tyler, Bound. chap. 6.

The survey was not authenticated. The certificate is not
accompanied with the field-notes, and, as evidence, is entirely
worthless under the decision of this Court : *Wilson v. Hoff-
man*, 54 Mich. 246.

CHAMPLIN, J. In 1838 the government of the United
States caused to be surveyed a portion of its public land in

Michigan, and to be subdivided into sections fractional T. 18. N., R. 18 W.

This survey was made by Sylvester Sibley, a deputy sur-- veyor, between July 16 and December 28, 1838. His field-- notes of section 26 in this town show that the section as sur- veyed by him was fractional; that, starting from the corner of sections 25, 26, 35, and 36, and running north, between 25 and 26, 37 ch. 44 l., he struck the shore of the Pere Mar- quette lake, and that at 40 ch., where, by his instructions, he should have set the quarter-section corner, he was in the lake.

They also show that the section line between sections 26 and 27 ran north 46 ch. 84 l., to the south side of the lake, and that the remainder of the mile was in the lake, and that the section corners of 22, 23, 26, and 27 were in the lake, as also was the line between sections 23 and 26.

From these field-notes the land upon section 26 was platted into two eighty-acre parcels on the south, and the balance lying between these parcels and the lake was divided into four lots, 20 ch. in width on the south, and extending to the lake, numbered 1, 2, 3, and 4.

Sections 23 and 24 were surveyed also as fractional and having the lake for their southern boundary.

Pere Marquette lake is a widening of the Pere Marquette river, which flows from the interior of the State and dis- charges through a narrow channel into Lake Michigan a short distance from Pere Marquette lake.

The right bank of the Pere Marquette river, and extend- ing through sections 24 and 23, is meandered.

The left shore through section 26 was not meandered by the government surveyor.

Upon the map in the surveyor general's office the terri- tory between these fractional lots is represented as water, and as a part of the Pere Marquette lake. On the next page is a copy of the map in the surveyor general's office.

A portion of section 26 is the open water of Pere Mar- quette lake. That portion in controversy in this suit is not navigable for vessels, and, except in well-defined channels,

vegetation, consisting of wild rice, wild grass, and rushes, in the summer season, grows up through the water. The whole tract is, however, covered with water in all seasons at all times from several inches to several feet in depth, and underneath this water is a deposit of mud.

In the channel spoken of there is a perceptible current flowing towards the clear waters of the lake, and outside of these channels there is no current perceptible. These channels are not confined in or defined by any banks or shore lines of earth, but merely by the growth of vegetation appearing above the water in which it grows.

No land has ever been seen above the water within the territory described in the plaintiff's declaration in this case. It is not susceptible of being drained or reclaimed, except by diking around the territory so as to exclude the waters of the lake, and pumping out the water and mud. This has been the character and condition of the premises in dispute from 1838 to the present time. About 1850 the United States conveyed by patents to George Farnsworth lots 1, 2, 3, and 4 of section 26, lots 3 and 4 of section 23, and lot 1 of section 24, T. 18 N., R. 18 W., being the marginal fractional

lots to the north and north-east, south and south-west, of the premises in suit. The title to these marginal fractional lots came by mesne conveyances to the defendant, their last deed bearing date January 2, 1873. The defendant is an incorporated company under the statutes of the State of Michigan, and has used the area in controversy in booming, sorting, and rafting logs, under its franchise granted by the State.

The plaintiff in this suit brings this action of ejectment to dispossess defendant from the occupation of a portion of section 26 claimed by it in virtue of its riparian proprietorship of lots surveyed by the United States in 1838 and sold to Farnsworth as above stated. The premises claimed by plaintiff are described in his declaration as follows:

"Lots 5, 6, 7, and 9 of section 26, in T. 18 N., of R. 18 W., which premises plaintiff claims in fee; also all the lands lying between the center of the Pere Marquette river and the south side of lots 5, 6, and 7 of section 26, in T. 18 N., of R. 18 W., which plaintiff claims in fee as riparian owner; also all that part of land covered by the waters of the Pere Marquette lake, so called, between a line running west parallel with the north line of section 26, in T. 18 N. of R. 18 W., to a point north of the west end of lot 5 in said section, thence south to the west end of lot 5, being the land covered by the waters of said lake, west and north of, and adjacent to, lots 5 and 9 of said section, which land so covered by water as aforesaid plaintiff claims in fee as riparian owner thereof."

To sustain this declaration, on the trial in the court below, he introduced in evidence a certified copy of a map or diagram of the premises in question, certified to by the commissioner of the general land office at Washington, a copy of which will be found on the following page.

A patent from the United States to the plaintiff for lots 5 and 6 in sec. 26, T. 18 N., R. 18 W., dated September 3, 1884.

A patent from the United States to Jonathan B. Salisbury, conveying lots 7, 8, and 9 in sec. 26 aforesaid.

A deed from Jonathan B. Salisbury to William L. Web-

ber, trustee, dated September 25, 1884, conveying the same lots, 7, 8, and 9. The patent to plaintiff, of date September 3, 1884, was based upon what is known as "Valentine Scrip," issued under an act of Congress approved April 5, 1872, entitled "An Act for the Relief of Thomas B. Valentine."

The act provides for the issuing of scrip to Valentine and his legal representatives, in legal subdivisions, which scrip shall entitle the holder to "patents for an equal quantity of the unoccupied and unappropriated lands of the United States not mineral."

It is claimed by defendant that the patent to plaintiff is void for excess,—that the act authorizing the location of the scrip only authorized it to be laid upon legal subdivisions. The scrip in this case was made to cover two government descriptions or subdivisions of land, the total of which exceeded 40 acres.

We do not consider this question open to defendant. If the land belonged to the government and was subject to sale by it, the question raised is one exclusively between the government and the patentee, in which third parties are in no way concerned.

The defendant is admitted to be in possession, and the

plaintiff must recover, if at all, upon the strength of his own title.

He produced patents from the United States based upon a survey made by the deputy United States surveyor under instructions from the commissioner of the general land office bearing date August 7, 1883.   The field-notes of the survey have not been introduced in evidence, and there is nothing to indicate any reason why a survey was made at so recent a date, unless an inference may be drawn from the plat or diagram introduced in evidence, which describes the diagram as a "plat of an island in sec. 26, T. 18 N., R. 18 W., Michigan."

Under a somewhat liberal construction of the tenth section of an act of Congress approved May 30, 1862,[1] entitled "An Act to Reduce the Expenses of the Survey and Sale of the Public Lands in the United States," it has been the practice for the commissioner of the general land office, upon proper application, and deposit of the required moneys to pay the expenses of the survey and other expenses, to order a survey of such islands as were omitted when the surveys were extended over the adjacent lands, and when such surveys are made, then the lands embraced therein become subject to the same laws and regulations that other public lands are.

To give the commissioner jurisdiction to act, two facts must exist.

1. There must have been an island which was omitted from the surveys when the adjacent territory was surveyed.

2. The land must not have been previously conveyed by the United States.

The evidence returned in this record shows conclusively and without contradiction that no island upon section 26 was omitted from the survey made by the United States in 1838; that no island existed or now exists where the plat offered in evidence by the plaintiff represents that there is an island.

An island is a body of land *surrounded* by water.   The premises described in plaintiff's declaration and in his patents is a body of land *covered* by water.   To call this submerged fen an island is a palpable misnomer.

---

[1] Rev. Stat. U. S. title 32, chap. 9, § 2401.

There existed no authority for the commissioner of the general land office to order a survey of this body of water, on the hypothesis that it was a part of the public domain which had been omitted from the government survey. From the character of the premises in dispute, as being water instead of land, we are of opinion that the United States parted with its title when it conveyed the lots to Farnsworth bordering upon this body of water.

It is the settled rule in this State that the title of the riparian owner extends to the middle line of the lake or stream of the inland waters. *Lorman v. Benson*, 8 Mich· 18; *Ryan v. Brown*, 18 Id. 196; *Rice v. Ruddiman*, 10 Id. 125; *Watson v. Peters*, 26 Id. 508; *Richardson v. Prentiss*, 48 Id. 88; *Bay City Gas Light Co. v. Industrial Works*, 28 Id. 182; *Maxwell v. Bay City Bridge Co.*, 41 Id. 466; *Pere Marquette Boom Company v. Adams*, 44 Id. 403; *Backus v. Detroit*, 49 Id. 110; *Fletcher v. Thunder Bay River Boom Co.*, 51 Id. 277.,

This has become a rule of property in this State, and the Supreme Court recognizes the right of each state to determine the doctrine for itself. *Barney v. Keokuk*, 94 U. S. 324.

Plaintiff recognizes this as the established doctrine. Two counts in his declaration are based upon riparian ownership consequent upon his ownership of the adjacent lands.

Upon both of these jurisdictional points we are of opinion that the patents upon which plaintiff relies for title are void. The objection to them reaches beyond the action of the commissioner of the general land office, and goes to the existence of a subject upon which he was competent to act.

Patents issued by the United States conveying its lands are in general unassailable in an action at law. They not only operate to pass the title, but they carry with them a conclusive presumption that all requirements preliminary to their issue have been complied with. This principle was laid down with great clearness and force by Mr. Justice Field in the case of *Smelting Co. v. Kemp*, 104 U. S. 636, in which he also notes the exception to the rule as follows:

"Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal not having jurisdiction of the case which it had assumed to decide."

The learned judge then proceeds to show that these views have been entertained by the Supreme Court of the United States from the decision in case of *Polk's Lessee v. Wendal,* reported in 9 Cranch, 87, to the present time. As a conclusion, on page 646, he says:

"On the other hand, a patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale, or dedicated to special purposes, or had been previously transferred to others."

The evidence in this case shows that the United States had, previously to issuing the patents to plaintiff, transferred its title to Farnsworth by conveying to him the lots bordering on the shore, and that such Farnsworth patents conveyed the territory in question as river or lake bed, according to the principles recognized in this State as applicable to riparian proprietors.

The argument of the plaintiff, based upon the ordinance of 1787 for the government of the Northwest Territory, and the act of Congress admitting Michigan as a State in the Union, together with the ordinance of July 25, 1836, adopted by the Legislature of Michigan, has been considered. We think the propositions advanced by him are fully met and

answered in the opinions of the court in the cases of *Pollard v. Hagan*, 3 How. 212, and *St. Louis v. Myers*, 113 U. S. 566. In the latter case Mr. Chief Justice Waite said :

"We are unable to discover that any federal right was denied the city by the decision which has been rendered. The act of Congress providing for the admission of Missouri into the Union (act of March 6, 1820, chap. 22, 3 Stat. 545), and which declares that the Mississippi river shall be ' a common highway and forever free,' has been referred to in the argument here, but the rights of riparian owners are nowhere mentioned in that act. They are left to be settled according to the principles of state law."

The same may be said of the ordinance of 1787 and the acts admitting Michigan into the Union.

Applying the principles of state law to the case under consideration, we are of opinion that the judgment of the circuit court should be affirmed, and it is so ordered.

The other Justices concurred.