Cooley v. Golden.

## COOLEY, Appellant, v. GOLDEN.

### In Banc, June 19, 1893.

1. **Public Lands** : GOVERNMENT GRANT: NAVIGABLE STREAM: MISSOURI RIVER. A grantee from the United States of land in this state on the banks of a navigable stream, such as the Missouri river, takes only to the water's edge, and not to the middle of the stream.

2. **Land Grant** : NAVIGABLE STREAM: ACCRETION AND RELICTION. The grantee can claim in addition to the original grant only such further land as may have been added by the regular process of accretion or reliction.

3. ———: ———: ———. The formation by accretion or reliction must be imperceptible, and must be made to the contiguous land so as to change the position of the water's margin or edge.

4. ———: ———: ISLAND: MISSOURI RIVER. The owner of the bank on the Missouri river is not the owner of an island which springs up in the midst of the river, whether the island be on the one side or the other of the thread of the river.

5. ———: ———: ———: ———: ACCRETION. Where, in such case, by accretions to the island, its water margin unites with the main shore, the newly made land becomes a part of the island and not of the main land, and the riparian ownership is not extended.

6. ———: ———: AVULSION. Where the river entirely forsakes its channel and forms a new one, the boundary lines of the adjacent land remain unchanged.

7. **Lands on Navigable River** : GOVERNMENT GRANT: LOCAL LAW. The fact that the grant of the government to land on the Missouri river banks, is construed by it as relinquishing its title to soil in the channel, does not necessarily imply that such relinquishment was for the benefit of the adjacent land; the extent of the grant depends on the local law of the state in which the granted lands are situated.

8. **Ejectment**: PRIOR POSSESSION. The right of plaintiff to recover the land sued for on the ground of prior possession *held* to have been fairly submitted to the jury by an instruction given in the case.

*Appeal from Atchison Circuit Court.*—HON. C. A. ANTHONY, Judge.

AFFIRMED.

*Lewis & Ramsey* for appellant.

(1) The court erred in refusing to give instruction number 1. This bar or island might fairly be considered an accretion in a state of formation begun prior to United States survey, but continuing to develop until united with the main shore. *Jones v. Soulard*, 24 How. 41. As appellant's lessor owned the lands along the Missouri shore to the river line, the accretions belonged to them, they passed with all conveyances, and it makes no difference that the shore lines were meandered at time of government survey. *Land Co. v. Jeffries*, 40 Fed. Rep. 386; Same case affirmed, 134 U. S. 178; *County of St. Clair v. Lovingston*, 23 Wall. 46. (2) As respondent only claimed to be in possession of government land and not adversely to any one, there was no statute of limitations in the case, and it was error of the court to modify plaintiff's instruction number 2 upon that question. (3) The court erred in giving instruction number 2 on part of defendant, and in refusing to give instruction number 6 asked by plaintiff. The evidence was undisputed that plaintiff had prior possession under color of right, and that defendant was a mere tresspasser as to the three-cornered or "flat-iron shaped" piece south of Pole Island tract; the instruction should have been for plaintiff as to that tract at least; and even if the instruction had been correctly given, the finding of the court was against the clear

weight of the evidence, and erroneous. *Norfleet v. Russell*, 64 Mo. 176; *Bledsoe v. Simms*, 53 Mo. 305; *Dale v. Faivre*, 43 Mo. 556. (4) The court erred in giving instruction number 1 for defendant, for the reason that it ignores the manner of the accretion's growth and union to the shore, and ignores also the question as to whether it was included in the original survey. Imperfect, growing and unsurveyed islands near the shore are presumed to belong to the adjacent owner; so held in *Railroad v. Schurnieir*, 7 Wall. 272; *Butler v. Grand Rapids*, 48 N. W. Rep. 569; *Chandos v. Mack*, 77 Wis. 573; *Chandos v. Mack*, 10 L. R. A. 207; *Rutz v. Seeger*; 35 Fed. Rep. 188; same case affirmed in 138 U. S. Sup. Court Rep. The court erred in finding for the defendant upon the whole case, the instructions were not only erroneous but the finding of the court was contrary to the weight of the evidence, and upon the whole evidence the finding should have been for plaintiff. See authorities already cited.

*M. McKillop* for respondent.

(1) The court committed no error in refusing to give instruction numbered 1 asked by plaintiff. Where lands bordering on a navigable river are so described in the instrument of conveyance as to make the stream one or more of the boundaries the grantee takes to the middle of the stream, while, if the description does not make the stream at least one of the boundaries of such land, the grantee takes only to the water edge, but may, of course, be entitled to accretions. *Railroad v. Schurnieir*, 7 Wall. 272; *School District v. Risley*, 10 Wall. 110; *Yates v. Milwaukee*, 10 Wall. 504; *Steel v. Sanches*, 33 N. W. Rep. 366; *County of St. Clair v. Lovingston*, 23 Wall. 46–69; 28 Myers' Federal Decisions, 720. (2) The Missouri river is by act of congress

declared a navigable stream. *Benson v. Morrow,* 61 Mo. 345; *Lamme v. Buse,* 70 Mo. 463; *Granger v. Swart,* 1 Woolworth, 88. (3) The court committed no error in giving instruction numbered 2 prayed for by defendant, nor in refusing number 6 as asked for by plaintiff. *Lamme v. Buse,* 70 Mo. 463; *Norfleet v. Russell,* 64 Mo. 176; *Dale v. Faevre,* 43 Mo. 556. (4) The court committed no error in making its finding on the whole case for the defendant. (5) It was incumbent on plaintiff to prove defendant's possession, and this he failed to do. *Clarkson v. Stanchfield,* 57 Mo. 573; *Caldwell v. Stephens,* 57 Mo. 589; *Callahan v. Davis,* 90 Mo. 78; *Bledsoe v. Simms,* 53 Mo. 305.

MACFARLANE, J.—The following statement prepared by BRACE, J., is adopted:

This is an action in ejectment brought by Millard F. Cooley, lessee of the Hamilton Land Company, against James F. Golden, for the recovery of a tract of about two hundred and seventy acres of unsurveyed lands lying south of fractional southeast quarter of section 32 and fractional southwest quarter of section 33, in township 67 of range 42, and south and west of fractional sections 3, 4 and 10, in township 66, of range 42, all west of fifth principal-meridian, in Atchison county, in this state, composed partly of an island called Pole island and a triangular tract of ground of about one hundred acres of relicted land in the old bed of the Missouri river. The answer was a general denial and a plea of statute of limitations.

Title emanated from the government to the aforesaid surveyed lands at various times from 1850 to 1856. It is not disputed that the plaintiff's lessor has acquired that title through various mesne conveyances, its immediate grantor being J. P., and A. H. Allen. The lands were surveyed about the year 1846. As riparian

owners of these surveyed lands, plaintiff's lessor claims
the land in controversy. The location of these lands
by such survey, with reference to the then existing bed
of the Missouri river, is shown by the following plat:

As will be observed they are on the north shore of the river.

The evidence tends to show that at the time of the government survey the current of the river washed this shore, that at some time previous, a bar had formed in the river opposite these surveyed lands; that in navigating the stream, boats passed between this bar and the north shore until about the year 1854, when the current changed and afterwards ran, and boats passed, south of it. At the time of the survey this sand bar had been in existence for some years. It was a long, narrow strip containing perhaps an hundred acres or more, upon which young cotton wood and willows had grown to the height of fifty or sixty feet, and became known as Pole island. It was not noticed in any way in the government survey. After the current changed in 1854, the water-way between it and the main shore began to fill up, and it soon became so united to the main shore, to the north-west of it, that in an ordinary stage of water persons could cross to it with teams by throwing in a little brush in the depressions between the island and the main shore. The water of an independent stream called "Willow Slough" flowing into the old channel from the north however separated the principal part of the island from the main land to the north and northeast of it.

On the fifth day of July, 1867, the Missouri river being at a very high stage of water, suddenly cut through the narrow neck of land between sections 18 and 30, township 66, range 42, and run all its water through said newly made cut and abandoned its old bed in the bend, fifteen miles long and from three-fourths of a mile to one mile wide; as shown in plat A. The peninsula of land so cut off by said avulsion and thrown east of the Missouri river is called

McKissock's island and continues to be a portion of Nebraska. This relicted territory was at first and for a year or two stagnant ponds of water. Gradually, however, by drainage and evaporation it became comparatively dry, except water standing in a few low places. Occasionally when the Missouri river was high it would overflow this ground as well as the surrounding country and deposit sediment on said low ground. In time vegetation commenced to grow on it, trees appeared and about 1881-2-3, much of it became fit for pasture and cultivation. It is still much lower than the surveyed lands surrounding it on the Missouri and Nebraska shores and has in many places deep sloughs and depressions in which water rests a good portion of the year. It is as a general rule higher in the center than it is next the shore, and there is a deep depression all along the main shore between this relicted land and the originally surveyed lands, leaving the border of the originally surveyed shore higher than the relicted lands all around.

From a point on the Missouri shore, seventy-seven chains east of the northwest corner of section 5, township 66, range 42, runs a public road due south, crossing the west end of Pole island across the aforesaid relicted land to that portion of the Nebraska shore called McKissock island, and the lands in controversy and claimed by appellant is that portion of Pole island lying east of said road and a portion of said reliction in a triangular shape lying south of said island.

The condition of the old bed of the river at the time this suit was brought, and the situation of the land in controversy and the respective claims of the parties is illustrated by the following plat:

Cooley v. Golden.

The land sued for is included within the lines A, B, C, D, A. The irregular line D A, being the southwest shore of Willow slough until it reaches a point due east of point A, thence due west to said point. The old bed is four hundred rods wide where the aforesaid public road crosses, but gradually narrows as we follow down the river until it is only one hundred rods wide some two miles below.

Plaintiff's lessors own all the surveyed lands on the Missouri shore opposite the Pole island tract, surveyed to the river's edge, and they and their grantors have held it for various periods from time of original entries, varying from 1850 to 1861 to the present time. Plaintiff's lessors also own the surveyed lands along the opposite Nebraska shore, and their immediate grantors (the Allens), in 1886 fenced the lands on the Nebraska side into a pasture, extending their fences across the old bed onto the Missouri side, to a point about one hundred and twenty-four rods north of the center of the old bed along the road, where the drain or slough called the Northern or Venable slough, runs through the old bed; the fence then followed in a southeastly direction down this slough to a point where the water was deep enough to turn stock; the pasture was fenced with post and wire fences except where the sloughs and streams were sufficient to prevent escape of cattle, and embraced about seven hundred or eight hundred acres of pastures, about one hundred acres of which, being the triangular piece contained within the lines 2B c2, in northwest part, is included in the lands in this suit. This one hundred acres is the only part of the lands in controversy that was ever in actual possession of plaintiff or those under whom he claims. The Allens were the first to ever fence or use it in any way, and plaintiff has possession first as their tenant and afterwards as tenant of the Hamilton Land

Company, which succeeded to their interest. The remainder of the lands in controversy were never in plaintiff's actual possession. Defendant in the year 1888 purchased the claim of a squatter named Mrs. Bird, who had lived on Pole island several years with her children after her husband's death. She made him a deed describing in a general way Pole island, and afterwards (after Golden had had a survey made) she executed another deed describing a track by metes and bounds as in plaintiff's petition. These deeds were recorded in Atchison county, and were the only ones recorded by defendant and those under whom he claims.

Mrs. Bird's husband, who died in 1882, seems to have taken possession of the island in 1881, by virtue of a purchase from a man by the name of Wilcox, who had been in possession from 1868 or 1869, and who succeeded to the possession of several precedent squatters whose possession ran back as far probably as 1860 or 1861. So that the defendant and those under whom he claims had been in the continuous adverse possession of Pole island proper for more than ten years before this suit was instituted. Mrs. Bird's fence seems to have run to Venable slough, but she claimed and deeded to the defendant the tract as described in the petition, and the defendant has enclosed and claims the tract as then deeded.

The case was tried by the court without a jury, the law declared by way of instructions, the finding and judgment was for the defendant, and the plaintiff appeals.

The foregoing statement prepared by JUDGE BRACE is adopted.

That plaintiff owns under mesne conveyances from the government the fractional sections of the land on the margin of the waters of the Missouri river, is con-

ceded by both parties. The most important inquiry, therefore, is whether such grant from the United States, being without reservation or condition, passed to the grantee the title to the land beneath the water to the center thread of the channel, or only to that above the water line.

Under the well recognized rule of the common law, the extent of the grant is made to depend upon whether or not the river at the particular point is, or is not, navigable. And again rivers are held not to be navigable unless the tide ebbs and flows therein. In navigable streams, that is below tide water, the soil beneath the waters was vested in the crown in order to the protection of commerce, fisheries and other rights deemed public. On the other hand the soil beneath the waters of streams which are not navigable, that is, in which the tide does not ebb and flow or above tide water, is vested in the riparian owner to the center of the channel. Lord Blackburn says: "The property in the soil of the sea, and of estuaries, and of rivers, in which the tide ebbs and flows is *prima facie*, of common right, vested in the crown." *Bristow v. Cormican*, 3 App. Cases, 641.

In discussing the question as to what will pass by a grant bounded by a stream of water, the supreme court of Illinois, in an early case, says: "At the common law, this depended upon the character of the stream, or water. If it were a navigable stream, or water, the riparian proprietor extended only to high water mark. If it were a stream not navigable, the rights of the riparian owner extended to the center thread of the current. * * * At common law, only arms of the sea and streams where the tide ebbs and flows, are deemed navigable. Streams above tide water, although navigable in fact at all times, or in freshets, were not deemed navigable in law. To these, riparian proprie-

tors bounded on or by the river, could acquire exclusive ownership in the soil, water and fishery to the middle thread of the current; subject, however, to the public easement of navigation." *Middleton v. Pritchard*, 3 Scam. 510. See *Hardin v. Jordan*, 140 U. S. 372.

Now the Missouri river at the point in question is many hundreds of miles above the ebb and flow of the tide, and is and at the time of the grant of said lands from the government was, in fact, navigable. It is contended by plaintiff that, as the common law of England has been adopted in the state of Missouri, the unqualified grant of the lands by the government should be construed according to the principles of the common law, and under such construction his title would extend to the center of the channel. The argument being supported, as it is, by the decisions of the courts of many states, adopting the common law rule, has great weight and is entitled to serious consideration. Having given the matter such consideration, we have reached the conclusion that the conditions under which the rule was adopted and has been adhered to in England, do not exist in respect to the great rivers of the United States, and the reason for the rule not existing, as to the Missouri river, the rule itself should not be applied if one can be found under the changed conditions which is sounder in principle and policy.

In discussing the applicability of the rule of the common law to fresh water lakes, Chancellor Walworth says: "The principle itself does not appear to be sufficiently broad to embrace our *large fresh water lakes, or inland seas*, which are wholly unprovided for by the common law of England. As to these there is neither flow of the tide, or thread of the stream, and our own local law appears to have assigned the shores down to the low water mark to the riparian owners, and the

beds of the lakes with the islands therein to the public."
*Canal Commissioners v. People,* 5 Wend. 446.

Probably no river in England, in the day of SIR
MATTHEW HALE, who first formulated the common law
rule, was navigable above tide water to more than the
smallest boats.    The Missouri river, at the time of this
grant, was navigable for the largest of river boats for
hundreds of miles.    It was at the point in question,
which is several hundred miles above its confluence with
the Mississippi, of a width of about one mile from shore
to shore.    It is a tortuous stream, flowing rapidly
through a valley of varying width, liable, as was shown
in this case, to sudden changes of its entire bed.    It is
very manifest that the principle of the common law, as
said by Chancellor Walworth "is not sufficiently broad
to embrace our large," western rivers.

As directly bearing on the subject, the remarks of
Mr. Justice FIELD, in a recent case, *Packer v. Bird,* 137
U. S. 666, are pertinent and convincing. He says:  "It
is undoubtedly the rule of the common law that the
title of owners of land bordering on rivers above the ebb
and flow of the tide extends to the middle of the stream,
but that where the waters of the river are affected by
the tides, the title of such owners is limited to ordinary
high-water mark.    The title to land below that mark in
such cases, is vested in England in the crown, and in
this country in the state within whose boundaries the
waters lie, private ownership of the soils under them
being deemed inconsistent with the interest of the pub-
lic at large in their use for purposes of commerce.    In
England this limitation of the right of the riparian
owner is confined to such navigable rivers as are
affected by the tides, because there the ebb and flow of
the tide constitute the usual test of the navigability of
the streams.    No rivers there, at least none of any con-
siderable extent, are navigable in fact, which are not

subject to the tides. In this country the situation is wholly different. Some of our rivers are navigable for many hundreds of miles above the limits of tide-water, and by vessels larger than any which sailed on the seas when the common law rule was established. A different test must, therefore, be sought to determine the navigability of our rivers, with the consequent rights both to the public and the riparian owner, and such test is found in their navigable capacity. Those rivers are regarded as public navigable rivers in law which are navigable in fact. And, as said in the case of *The Daniel Ball*, 10 Wall. 557, 563, 'they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'

"The same reasons, therefore, exist in this country for the exclusion of the right of private ownership over the soil under navigable waters when they are susceptible of being used as highways of commerce in the ordinary modes of trade and travel on water, as when their navigability is determined by the tidal test. It is, indeed, the susceptibility to use as highways of commerce which gives sanction to the public right of control over navigation upon them, and consequently to the exclusion of private ownership, either of the waters or the soils under them. The common law doctrine on this subject, prevailing in England, is held in some of the states, but in a large number has been considered as inapplicable to the navigable waters of the country, or, even if prevailing for a time has given way, or been greatly modified, under the different conditions there."

While it is true that many of the states retain the common law rule, in others it is rejected as being wholly inapplicable to the character of the fresh water

lakes and large rivers of the United States. For exhaustive reviews of the authorities see *McManus v. Carmichael*, 3 Iowa 1, and *People ex rel. v. Canal Appraisers*, 33 N. Y. 461. The latter case was dintinguished in *Smith v. Rochester*, 92 N. Y. 473, and the common law doctrine substantially affirmed.

The rule has been declared in many of the states inapplicable to the conditions of this country, and is wholly inconsistent with the actual navigability of the rivers, the control retained by congress over the commerce and navigation of the rivers, the rules of the general land office in the survey and sale of the public lands bordering on the rivers, and the recognition by congress of the navigability of the Missouri river. See collation of authorities in Gould on Waters, secs. 56, *et seq.* The act of congress providing for the government of the territory of Missouri provided that the Mississippi and Missouri rivers should be common highways and forever free to the people of the said territory and to the citizens of the United States. 2 U. S. Statutes at Large, p. 747, sec. 15. These are the very conditions upon which the right to the soil under the waters of navigable streams was retained in the crown. The rule most applicable to the condition of the Missouri river would be that applied by the common law to navigable rivers, and the riparian owner should only take title to the waters edge.

This extended consideration of the question as an original one has been given in part on account of its importance, and the quantity and value of the land that may be affected, and in part on account of the earnestness and ability with which the doctrine of the common law has been supported by counsel.

The identical question was very fully discussed by this court in the year 1875, in the case of *Benson v. Morrow*, 61 Mo. 347, in which the conclusion was

reached that the application of the common law principle could not be transferred to our great public rivers, and that the proprietor of land on the banks of the Missouri river does not own to the middle of the stream, but only to the water's edge. This decision has been approved in two cases decided by Division Two of this court at this term. *Naylor v. Cox*, 114 Mo. 232, and *Rees v. McDaniel*, 115 Mo. 145. See cases cited in the opinion in the latter case.

Plaintiff only taking title to the margin of the river can claim in addition to the original grants only such land as may have been added thereto by the regular process of accretion or reliction. "Land formed by *alluvion*, or the gradual and imperceptible accretion from the water, and land gained by *reliction*, or the gradual and imperceptible recession of the water belong to the owner of the contiguous land to which the addition is made. There is no distinction in this respect between soil gained by accretion and that uncovered by reliction." Gould on Waters, sec. 155.

The formation or reliction must be imperceptible and must be made to the contiguous land so as to change the position of the waters edge or margin. Hence it is said in *Benson v. Morrow*, *supra*, that the owner of the contiguous land is not the "owner of an island that springs up in the midst of the stream, whether the island be on one side or the other of the thread of the river. He goes only to the margin of the river."

It would also logically follow that if by accretions to such island the water margin should unite with the shore, the new made land would become a part of the island and not of the main land, and the riparian ownership would not be extended. It is so held in *Buse v. Russell*, 86 Mo. 211 and *Naylor v. Cox*,

*supra.* It makes no difference in principle that the islands in these cases had been surveyed and disposed of by the United States. The riparian owner would not take the accretion for the reason that it was not added to his own land.

Pole island sprang up in the midst of the stream, far enough from the shore, which bounded plaintiff's land, to admit, at times, of the passage of boats between it and the shore. The banks of the island and that of the north shore of the river afterwards united by accretions formed by the washing of the waters and plaintiff was only entitled to such part thereof as was formed upon his land. *Buse v. Russell,* *supra; Naylor v. Cox, supra.*

If the waters of a navigable river or lake recede gradually and insensibly, the derelict land belongs to the riparian proprietors and their boundaries change as the waters receded. This is on the same principle as that under which they take by accretions. The recession must be gradual and imperceptible. In case the river, from storm, flood or other cause, entirely forsakes its channel and forms a new one, the boundary lines remain unchanged. Angell on Water Courses, sec. 59; *Nebraska v. Iowa,* 143 U. S. 359; *Rees v. McDaniel, supra,* and cases cited.

The change of the channel of the river in this case was of such a character, and plaintiff had no claim to the relicted land caused thereby. The boundary of his land remained at the water line of the old channel.

The claim is now made that inasmuch as the new channel, thus formed by avulsion, is at once subject to the public use, the relicted land, should of right, vest in the riparian proprietors on the principle upon which the right to the accretion is sometimes placed, that as every proprietor whose land is thus bounded, is subject to loss, by the same means which may add to his

territory; and as he is without remedy for his loss, in this way he cannot be held accountable for his gain." *New Orleans v. United States*, 10 Peters 662, 717; *Jefferis v. East Omaha, Land Co.*, 134 U. S. 189. It is claimed that such a rule would be peculiarly applicable and just if applied to the Missouri river, which from its tortuous course, the rapidity of its current and the character of its soil is so subject to such sudden changes. Such a rule could not be justly applied for the reason that in most cases the one who loses his land by the avulsion would gain nothing by the reliction and the one who would gain by the reliction would lose nothing by the avulsion.

Nothwithstanding the character of the Missouri river, and that of the soil through which it flows, it is held that the principle applying to accretions and relictions in other streams apply also to it. *Jefferis v. East Omaha Land Co.*, supra; *Nebraska v. Iowa*, supra.

The general rule seems to be the only one the courts can justly apply. In view of the more rapid formations of new land by accretions and relictions, caused by the peculiarity of the river and of the soil, the time in which the formations are made, if done gradually, imperceptibly and upon the bank should make less difference than in case of rivers less subject to changes.

Again it is insisted that as the river is navigable, the general government alone has the right to the soil beneath the waters in the channel and as the United States construes its grants of lands bounded thereby as relinquishing its title to the center of the stream as of lands on the rivers that are not navigable, such grants carry the title of the grantee to the center of the channel subject only to the rights of the public.

The fact that the United States relinquished its title to the soil beneath the water does not necessarily

imply that such relinquishment was intended for the benefit of the grantee of the adjacent land. The extent of the grant depends upon the law of the state in which the land granted is situate. In the case of *Hardin v. Jordan, supra*, it is said by the supreme court of the United States: "In our judgment, the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie." It is true in that case three justices dissented, but all agreed upon the foregoing proposition. Mr. Justice BREWER, who wrote the dissenting opinion, quoted approvingly from the opinion of Mr. Justice BLATCHFORD in *St. Louis v. Rutz*, 138 U. S. 226, 242, as follows: "The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi river, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property, which is governed by the local law of Illinois."

As has been seen, under the decisions of this court, the riparian owner took title only to the water's edge, and the grant of the United States carried his title no further. In the case of *Barney v. Keokuk*, 94 U. S. 324, it is said: "If the states choose to resign to the riparian proprietor, rights which properly belong to them in their sovereign capacity, it is not for others to raise objection." This declaration was cited with approval in *Packer v. Bird*, 137 U. S. 666, and *St. Louis v. Rutz, supra*.

It is apparent from these decisions that when the United States relinquished its rights to the soil under the waters of the Missouri river, it was intended that the states in their sovereign capacity should succeed to all the rights so relinquished. We are not aware of any legislation in this state disposing of the land under the

waters of its navigable rivers or of relicted land from sudden changes in the channel. Whether those whose lands have been taken by changes of the bed of the rivers should be compensated from the relicted lands is a question for the determination of the legislative department of the state. We can only say now that the ownership of land in this state is subject to such changes as may be wrought by the natural action of the waters of the navigable rivers upon it.

Plaintiff claims that he was entitled to recover a portion of the land sued for on account of a prior possession, though neither party showed title in himself.

That question was fairly submitted under the following instructions:

"6. If the plaintiff or his lessor was in possession of any portion of the land in controversy by having the same fenced as a pasture and the defendant afterwards, while the same was so fenced, entered upon the same without plaintiff's consent, then plaintiff will be entitled to recover without proving any further title than prior possession, and if the evidence in the case identifies with such degree of certainty, any land in plaintiff's petition described, as was in the possession of the plaintiff or his lessor, and of which defendant took possession without plaintiff's consent, the plaintiff would be entitled to recover so much of the land as his evidence shows plaintiff or his lessor was in possession of, and that the defendant entered and held against him."

The case was tried substantially according to the views herein expressed, and the judgment is affirmed. All concur except BRACE, J., who dissents, and BARCLAY, J., who expresses no opinion.

BRACE, J., (*dissenting*).—I. The Missouri river is the boundary between the states of Missouri and Nebraska. It is well settled "that where a stream

which is a boundary from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was in the center of the old channel, although no water may be flowing therein." *Nebraska v. Iowa*, 143 U. S. 359.

The word channel as applied here to the Missouri river means the bed in which the main stream of the river flowed, rather than the deep water of the stream as followed in navigation. Black's Law Dictionary, p. 193; *Bridge Co. v. County of Dubuque*, 55 Iowa, 558. BECK, J., in delivering the opinion of the court in the case cited, says: "The word is used, in its primary meaning above indicated, to describe the course and place of streams that have ceased to flow, and to designate new beds of rivers which owe their existence, either to natural or artificial causes. The geographer speaks of the channels of ancient rivers, in which no water now flows; great floods or the industry of men sometimes change the course of streams it is said by opening new channels. When the word is thus used it means the bed of the river from bank to bank." Some of his subsequent remarks in regard to the channel of the Mississippi river of which he was treating apply with more force to the Missouri. After noting that the main river is always readily distinguished, he says: "the course of navigation follows the deepest water; this is sometimes on one side of the river, and very near the shore, and sometimes on the other. Sometimes it is at right angles with the current, and not unfrequently the navigator in descending the river, must direct his vessel against the current in order to keep in the deepest water. Changes are continually occurring in the line of deep water followed by the vessels, caused by the shifting nature of the sandbars every where found in the river. The course

of navigation, which follows what boatmen call the channel, is extremely sinuous and often changing, and is unknown except to experienced navigators. On the other hand, the bed of the main river designated by the word channel, used in its primary sense, is the great body of water flowing down the stream.   *   *   * It cannot be possible that congress and the people of the state, in describing its boundary, used the word channel to describe the sinuous, obscure and changing line of navigation, rather than the broad and distinctly defined bed of the main river. The center of this river bed, channel, may be readily determined, while the center of the navigable channel often could not be known with certainty. The first is a fit boundary line of a state; the second cannot be.''

It seems to be accepted law that when a river suddenly changes its course or deserts the original channel, "the boundary remains in the middle of the deserted bed." *Buttenuth v. St. Louis Bridge Co.*, 123 Ill. 535; *St. Louis v. Rutz*, 138 U. S. 245.

And in the case in hand it can not be doubted that the boundary line between the' two states at the place in controversy is a line equidistant from the well defined shores of the stream at the time of the cut off, and as all the land sued for is north of that line, and next to the Missouri shore, all of it is within the boundaries and jurisdiction of the state of Missouri.

II. The next inquiry in order is, what land did plaintiff's grantors acquire from the government under their grant of the fractional section quarters, bordering on the Missouri shore of the river? These subdivisions on the side next to the river all have a common meandering line designating the river shore. In the recent case of *Hardin v. Jordan*, 140 U. S. 371, Mr. Justice BRADLEY in delivering the opinion of the court says, in regard to such lines: "It has been the practice of the

government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary. *Railroad v. Schurmeir*, 7 Wall. 272; *Jefferis v. East Omaha Land Co.*, 134 U. S. 178; *Middleton v. Pritchard*, 3 Scam. 510; *Canal Trustees v. Haven*, 5 Gilm. 548, 558; *Houck v. Yates*, 82 Ill. 179; *Fuller v. Dauphin*, 124 Ill. 542; *Boorman v. Sunnuchs*, 42 Wis. 233, 235; *Pere Marquette Boom Co. v. Adams*, 44 Mich. 403; *Clute v. Fisher*, 65 Mich. 48; *Ridgway v. Ludlow*, 58 Ind. 248; *Kraut v. Crawford*, 18 Iowa, 549; *Forsyth v. Smale*, 7 Biss. 201; Revised Statutes, secs. 2395, 2396. * * * It has never been held that the lands under water, in front of such grants, are reserved to the United States, or that they can be afterwards granted out to other persons to the injury of the orignal grantées.

"With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high water mark, and that the title to the shore and lands under water in front of lands so granted enures to the state within which they are situated if a state has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty

of the state—a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery—and cannot be retained or granted out to individuals by the United States. *Pollard* v. *Hagan*, 3 How. 212; *Goodtitle v. Kibbe*, 9 How. 471; *Weber v. Harbor Commissioners*, 18 Wall. 57.  *    *    *

"This right of the states to regulate and control the shores of tide waters and the land under them is the same as that which is exercised by the crown of England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas, and also in some of the states to navigable rivers as the Mississippi, the Missouri, the Ohio, and in Pennsylvania to all the permanent rivers of the state; but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised. In the case of *Barney* v. *Keokuk*, 94 U. S. 324, we held that it is for the several states themselves to determine this question and that if they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity it is not for others to raise objections.  *    *    *. The same view was taken in quite a recent case with regard to titles on the Sacramen to river under the law of California. *Packer v. Bird*, 137 U. S. 661.

"On the east side of the Mississippi in the state of Illinois and Mississippi, a different doctrine prevails, and in those states it is held that the title of the riparian proprietor extends to the middle of the current in conformity to the rule of the common law, that the beds of all streams above the flow of the tide, whether actually navigable or not, belong to the proprietors of the adjoining lands. *Middleton v. Pritchard*, 3 Scammon, 510; *Morgan v. Reading*, 3 Sm. & Marsh. 366;

*St. Louis v. Rutz*, 138 U. S. 226. In the one case, that of Iowa, the government grant was held to extend only to high water mark; in other cases of Illinois and Mississippi, it was held to extend to the center of the stream, being governed in both cases by the respective laws of the states affecting grants of land bordering on the river. In the one case the state by its general law, does not allow the grant to enure to the individual farther than to the water's edge, reserving to itself the ownership and control of the river bed; in the other cases the states allow the full common law effect of the grant to enure to the grantee, reserving to themselves only those rights of eminent domain over the waters, and the land covered thereby, which are inseparable from sovereignty.

"As was well said by the supreme court of Illinois in *Middleton v. Pritchard, supra*: 'Where the government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it. What will pass then by a grant bounded by a stream of water? At common law this depended upon the character of the stream of water. If it were a navigable stream or water, the riparian proprietor extended only to high water mark. If it were a stream not navigable the rights of the riparian owner extended to the center thread of the current. * * * At common law, only arms of the sea and streams where the tide ebbs and flows are deemed navigable. Streams above tide water although navigable in fact at all times or in freshets, were not deemed navigable in law. To these, riparian proprietors bounded on or by the river, could acquire exclusive ownership in the soil, water and fishery to the middle thread of the current; sub-

ject, however, to the public easement of navigation. And this latter, Chancellor Kent says, bears a perfect resemblance to public highways. The consequence of this doctrine is, that all grants bounded upon a river not navigable by the common law entitle the grantee to all islands lying between the main land and the center thread of the current. And we feel bound so to construe grants by the government according to the principles of the common law unless the government has done some act to qualify or exclude the right. * * * The United States have not repealed the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to or imposed upon the terms of the ordinary conveyances which they use except in a few special instances; but these are left to the principles of law, and the rules adopted by each local government where the land may lie. We have adopted the common law, and must therefore apply its principles to the interpretation of their grant.' These views are referred to with strong approval by Chancellor Kent in a note, the third volume of his commentaries, p. 427, sixth addition, being the last addition prepared under his own supervision."

No words of ours could add to the force or lucidity of this statement of the law on this question, applicable as well to Missouri as Illinois; for we also have adopted the common law and must apply its principles.

As was said by the supreme court of Michigan in the recent case of *Butler v. Railroad*, 48 N. W. Rep. 569: "This rule applies to grants by the United States government as well as to grants by individuals. The legal maxim must here be borne in mind, that all grants must be construed most strongly against the grantors. To this maxim the government forms no excep-

tion. Reservation cannot be implied. When therefore the government has surveyed its lands along the bank of the river, and has sold and conveyed such land by government subdivisions its patent conveys the title to all lands lying between the meander line and the middle thread of the river, unless previous to such patent it has surveyed such islands as governmental subdivisions or expressly reserves them when not surveyed. *Webber v. Boom Co.*, 62 Mich. 626; 30 N. W. Rep. 469; *Fletcher v. Boom Co.* 51 Mich. 277; 16 N. W. Rep. 645; *Granger v. Avery*, 64 Me. 292; *Jones v. Sonlard*, 24 How. 41; *Middleton v. Pritchard, supra*; *Chandos v. Mack*, 77 Wis. 573; 46 N. W. Rep. 803; *Railroad v. Schurmeir, supra; Jefferis v. East Omaha Land Co.*, 134 U. S. 178.

And "it is laid down by all the authorities that if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is the property of such riparian proprietor. He retains the title to the land previously owned by him with the new deposits thereon." *St. Louis v. Rutz*, 138 U. S. 245, *loc. cit.*

These recent authorities render unnecessary a review of the many cases in which this question has been discussed, and clearly and satisfactorily answer the question propounded at the beginning of this paragraph, that the plaintiff's grantors acquired from the government, title to the middle of the thread of the Missouri river opposite their surveyed riparian lands, which, according to the evidence, covers all the land sued for, and which plaintiff ought to recover, except as to so much thereof as the defendant may have acquired title to by adverse possession. The rule governing such adverse possession would of course be the same as to the surveyed lands.

III. It will not be necessary to notice the instructions in detail or at length. The case was evidently tried upon the theory broadly stated in the head note to the case of *Benson v. Morrow*, 61 Mo. 345; that "under the acts of congress and the decisions of the United States supreme court, the ancient doctrine distinguishing navigable and non-navigable rivers by their position above or below tide-water is done away with, and the Missouri river is a navigable stream. And hence, as in other cases of navigable rivers, the proprietor of land on its banks owns only to the water's edge."

The decision in this case was rendered in 1875. It would not be profitable now to determine whether or not the deduction there drawn was warranted by the earlier decisions of the supreme court of the United States. It is evident, however, from the reading of the case, that this conclusion was reached in deference to what was then supposed by the court to be the doctrine of the United States supreme court upon the subject, a doctrine which, if ever, is now no longer maintained by that court, as is evidenced by the most recent decisions of that tribunal hereinbefore cited.

With this idea eliminated, it is impossible to see now upon what principle the rights of riparian proprietors upon the shores of the Missouri can be governed, other than upon the doctrine of the common law applicable to all fresh-water streams, made the law of this state by statute, and by which such proprietor owns to the middle of the thread of the stream, subject to the right of public navigation secured by acts of congress. This wholesome doctrine so ably maintained by the supreme court of Illinois in *Middleton v. Pritchard, supra,* which commended itself so strongly to the mind of Chancellor Kent, and which has now received the sanction of the supreme court of the United States in

*Hardin v. Jordan, supra,* ought to become the settled law of this state, as tending to the repose of the titles of its citizens to lands bordering on its streams, and to a definite and easily ascertained location of their boundaries.

The Missouri river is important to the state only as a public highway, and so long as the law is maintained that makes it such, no public right, state or national, will be impinged, in subjecting its bed to the stable and well understood rule of the common law defining the boundaries of its riparian proprietors.

The judgment, in my opinion, ought to be reversed, and the cause remanded for new trial in accordance with these views.