I. E. GASKILL and Lucile June Gaskill, Plaintiffs-Respondents,

v.

Frances F. COOK, formerly Frances F. Graybill et al., Defendants,

Frances F. Cook, Defendant-Appellant.

No. 46038.

Supreme Court of Missouri,

Division No. 1.

July 14, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 8, 1958.

748

Louis Kranitz, Kranitz & Kranitz, St. Joseph, and Walter A. Raymond, Kenneth C. West, Kansas City, for appellant.

Randolph & Randolph, by Lewis F. Randolph, St. Joseph, and Pettijohn & Eiser, By James H. Pettijohn, Oregon, for respondents.

VAN OSDOL, Commissioner.

Plaintiffs instituted this action to try, ascertain and determine title (Section 527.150 RSMo 1949, V.A.M.S.), and for injunctive and other relief against defendant Frances F. Cook (formerly Frances F. Graybill) and others. The action involves title to parts of three described tracts of real estate, hereinafter referred to as Tracts Nos. 1, 2 and 3, situate in Buchanan County. Defendant Frances F. Cook filed answer and sought affirmative title relief. Issues of fact were submitted to a jury; the jury returned a verdict for plaintiffs; the trial court rendered judgment decreeing title in fee simple in plaintiffs and that none of defendants has any right, title or interest in and to the described real estate; and enjoined defendants from asserting, claiming or setting up any right, title, interest or claim in and to the property. Defendant Frances F. Cook has appealed from the judgment and decree.

Plaintiffs claim title to Tracts Nos. 1 and 2 through conveyances purportedly executed under the provisions of statutes now included in Chapter 241 RSMo 1949, V.A.M.S., pertaining to "Swamp Lands, Islands and Abandoned River Beds"—particularly Sections 241.160, 241.290, and 241.310 thereof.

Tract No. 1, containing 1520 acres in Sections 7, 18 and 19, in Township 56, Range 36, and in Sections 12, 13, 14, 23 and 24, Township 56, Range 37, was conveyed by sheriff's deed dated January 25, 1930, to plaintiff I. E. Gaskill. The conveyance described the tract as all the land situate with-

in the confines of the stated "meander of the shore line of said island," also as the land is described in a legend appended to the recorded plat of a survey by the deputy county surveyor as of October 8, 1929. See now plaintiffs' "Exhibit 5," reproduced below.

In the trial of this case, Tract No. 1 frequently was referred to by the witnesses as "Gaskill Island," or as the "big island." As will be observed by reference to the reproduced exhibit the tract was an irregularly elongated body of land lying in a northeast-southwest direction, and along the east side of it was that which was variously referred to by the witnesses as the "arm of the river," the "channel," the "slew," or the "chute."

December 16, 1929, one Meirl Emery, a single man, and Jasper Frakes and wife had executed a conveyance of lands comprising Tract No. 1 to one John G. Parkinson. It is inferred that Emery and Frakes or their predecessors had claimed the tract or portions thereof prior to the date of the sheriff's deed to plaintiff I. E. Gaskill. In 1931, plaintiff I. E. Gaskill instituted an action against Parkinson and others to try, ascertain and determine title; and in accordance with a compromise approved by decree of the Circuit Court of Buchanan County plaintiff Gaskill conveyed that part of the island lying east of the west line of Sections 7 and 18 to Parkinson by conveyance dated October 12, 1933; and Parkinson as of the same date conveyed the balance of the island to plaintiff I. E. Gaskill, who conveyed the same, October 17, 1933, to River Farms Company, a corporation of which I. E. Gaskill was the principal stockholder. River Farms Company conveyed the same land to plaintiffs, October 22, 1952. The decree of the Circuit Court of Buchanan County, rendered in the Gaskill-Parkinson case, included the finding that no part of the land in controversy in that title action (referred to as Tract No. 1 herein) "was accreted or laid up by sediment, * * * and that no owner of property on the East, Southeast, South or Southwest of the water between said island and the mainland, has any right, title or interest, by accretion or otherwise, to any part of said island, and that said island was formed in the bed of the Missouri River, and that no part thereof was cut off from the mainland by reason of the change of the current of said river or by avulsion." March 18, 1941, John G. Parkinson and wife conveyed that part of Sections 7 and 18 east of the west lines of those sections to John G. Parkinson, Jr. And on August 20, 1945, John G. Parkinson and wife and John G. Parkinson, Jr., and wife conveyed such tract to one Chris F. Hessler and wife, who on October 13, 1954, conveyed the tract to plaintiffs.

Tract No. 2, comprising 291.12 acres, was conveyed to plaintiff I. E. Gaskill by patent from Buchanan County, December 12, 1952, for the sum of $873. It was recited in the conveyance that it had been shown to the satisfaction of the County Court that the tract (No. 2) had been formed as an island in what was formerly the bed of the Missouri River. This tract lies along a southerly segment of the westerly line of Tract No. 1.

Tract No. 3 is claimed by plaintiffs as alluvion accreted to Tract No. 1 "on the East and South thereof."

Defendant Frances F. Cook (and her former husband, T. Ray Graybill, who died in 1934) acquired real estate by warranty deed dated May 27, 1931, from one Albert C. Markt and wife. The property was described as the north half of Sections 17 and 18 "and accretions thereto in parallel lines to the Missouri River," and the north half of the south half of Sections 17 and 18 (except the northeast quarter of the southwest quarter of Section 17) "and all accretions thereto in parallel lines to the Missouri River," all in Township 56, Range 36, Buchanan County. From the time the described real estate in Sections 17 and 18 was bought by the Graybills until the death of the former husband Graybill, the former husband "looked after" the farm, and since his death defendant (now married to John Cook), by her tenants, has occupied the land (to the eastward of the "big island") in Sections 17 and 18 (conveyed to the Graybills by the Markts in 1931) and has farmed such of the lands comprising Sections 17 and 18 as are situate east of the

island. Evidence tending to show defendant's farming operations on lands to the westward of the east line of the island is set forth infra as relevant to defendant's claim of title by adverse possession.

It is the position of defendant that the lands claimed by plaintiffs did not rise from the bed of the Missouri River "as an island," but were alluvion accreted to the east bank of the Missouri River, and defendant by answer claims such of the lands claimed by plaintiffs that lie to the west of the "channel," "slew," or "chute," including lands in Sections 13 and 14, by virtue of the conveyance from the Markts executed in 1931, as accretions to the lands described in such conveyance. As indicated, defendant also claims title by adverse possession and requests that title be decreed in her.

It is to be noted that not all of the land claimed by plaintiffs is claimed by defendant. The land, title to which is in issue, is that part of the "island" constituting the area contained in westwardly parallel projection from the north three-fourths of Sections 17 and 18 as described in the conveyance from the Markts to the Graybills, including land in Sections 13 and 14, Township 56, Range 37.

In the trial of this cause, the principal factual issues were drawn—was Gaskill Island an "island" which formed in the bed of the Missouri River, or was the area alluvion, having been accreted to the east shore of the Missouri, western boundary of defendant's land east of the channel or slough.

A witness, residing south of the "Gaskill place," had lived in that vicinity since 1907. He testified that the high land (where the land comprising the so-called island now is) was cut away by the eastward movement of the river. "The river cut it away —washed it away." None of the original land had remained after the river "moved over east." The "washing away" process lasted "I imagine around nine or ten years." There was then formed "a little chain of islands out there in the river. * * * they finally all connected up as one big island." After the island was formed, cottonwoods and willows started "growing out there." In 1930 there was a "good growth of cottonwood trees on it and willows—the trees, I imagine, eight to ten inches through on some of them." The larger trees were on the highest part, that is, the lower part of the island. The witness said the main current of the river was running on the east side of the island. Some boats went up there. "All the boats couldn't get up on the other side." The channel on the east side was five or six hundred feet in width. The channel was "I would say maybe a thousand feet" west of the Cook farmhouse (situate in the northwestern part of Section 17).

A witness for plaintiffs, who had hunted in the area of the island in the late 1920's, recalled that four boys were drowned northeast of the Cook improvements at a point about one-eighth of a mile north of the house. There was one big island west of where the boys were drowned. The channel was between the island and the land on which the Cook improvements were located; the channel was "I would say in the neighborhood of 750 feet wide." The current was very strong. This was in September, 1928. "Well, the island is still there. As far as I am concerned it isn't an island any more. The channel gradually narrowed down on this (east) side and most of the current got to going down the Kansas side. * * * My guess is that at that time (September, 1928) there was about as much water coming down on one side as there was on the other, but later most of the water commenced going down on the Kansas side."

Plaintiff I. E. Gaskill testified that he bought Tract No. 1 from the sheriff at the courthouse in St. Joseph. The tract was "sold at auction, after advertising." He paid $5,600 for it, and was delivered the sheriff's deed of January 25, 1930. When he first visited the land, the water along the east side of the tract was four or five hundred feet wide. This was at "ordinary

water" level. The current was running fast. He crossed over in a boat. During the year 1930, Gaskill built a barge 20 to 24 feet long which was pulled across the water east of the island by a cable more than 500 feet long. The cable frequently had to be taken down to allow the passage of boats used in reclamation work near or at the northerly end of the tract in the channel on the east side of the river. The barge was used for transportation across the channel for "probably three years," and then willows were cut and piled in and a short bridge was constructed. Gaskill cleared lands in the southerly portion of the island, constructed fences, and built a four-room house and a large barn thereon. Fences enclosed all the land except that conveyed to Parkinson. A fence was constructed along the west side of Section 18, thence east to the river. He had at one time two thousand lambs and five hundred ewes, and at other times two hundred cattle in Sections 13 and 14, in the area west of the land he had conveyed to Parkinson.

Water had run east of the island for eight or ten years, but the channel was "getting smaller all the time after I bought it." The channel finally narrowed down to where it was closed except for a small drain. It was a gradual process over a period of ten to twenty years. The government had driven piling to the northward "to check the current of the river and when the current was checked it dropped the sediment * * * until it filled up." In 1954, plaintiffs engaged one Riddle, county surveyor, to run a survey of a line in the center of the land which was formerly the bed of the channel or slough east of the island, "following this little drain that was left, where on each side it had settled." The Riddle survey followed the "lowest spot in that depression." See and compare Point Prairie Hunting & Fishing Club v. Schmidt, Mo.Sup., 44 S.W. 2d 73. (Plaintiffs disclaim ownership of any part of Sections 17 and 18 east of the easterly line delineated by the Riddle survey.)

As we have said, defendant's former husband, Graybill, and defendant (after the former husband's death) had farmed the lands east of the slough. Defendant introduced evidence tending to show that her son, Tom Graybill, moved to the Cook farm as his mother's tenant in 1940 and remained there until the end of the season of 1942. He occupied the Cook farmhouse in the northwestern portion of Section 17. During his tenancy, he tended about 120 acres west of the slough in parts of Sections 18 and 13. In 1940 he had seen a "shack" (which apparently had been used by the Parkinsons' tenant Roberts) and cornstalks in an area of Section 18 west of the slough. Defendant's son directed an employee to remove the shack. "How he removed it, I don't know. As far as the burning, it is very likely." The son Tom ran a wire fence along the south line which "did not enclose any of this ground." In 1953, he again put a fence in. He received a notice to remove it, but did not do so. It may be inferred, however, that the fence was removed by plaintiffs' employees.

One Harland succeeded the son as defendant's tenant. Harland remained on the Cook farm for eleven years. He was succeeded by the tenant Brown. The son Tom testified that Harland and Brown farmed the same ground west of the slough as was farmed by the son during his tenancy. (Harland, the tenant, plaintiffs' witness, testified he farmed the Cook lands from 1942 to 1954. He farmed "up against it [the slough]," on the east side. He put in 27 acres of wheat "on the west side" in the fall of 1943. The crop was flooded, and he "never was back there farming anymore.") Defendant testified her tenant Harland "did go over there (west of the slough) * * * three different straight years." Defendant said she leased to her tenants "all my deed said, all accretions to it are all leased to the tenant, to do as he saw fit on it." (There was evidence that plaintiffs, the Parkinsons, and the Hesslers had paid all taxes, including drainage tax-

es, on the lands, title to which is in controversy.)

The tenant Brown did some "cleaning up" work west of the slough in the latter part of 1953, and put in crops in 1954, 1955, and 1956. The Hesslers by registered letter, December 11, 1953, notified defendant that the "bulldozing operations" were considered a trespass, and demanded that defendant and her employees "cease and desist."

Reference is again made to the reproduction of plaintiffs' Exhibit 5, the surveyor's plat of October 8, 1929, indicating a channel or slough east of Tract No. 1. There also was introduced a map of a survey by the Corps of Engineers, War Department, as of July, 1923. The map shows a series of islands to the westward of that area which might be described as "fractional Section 18." Eight islands are indicated, the largest and most southerly of which is shown as bearing a growth of willows. There is shown a channel or arm of the river between these islands and the lands to the eastward. The channel is shown to be only a little less in width than that on the west (Kansas) side. An aerial photographic survey, Corps of Engineers, made in 1930, reflects the apparent joining of the several islands into a body of land in shape like Tract No. 1 as shown in the Exhibit 5. The channel east of the tract is shown, and there are seen lines indicating reclamation work on and along the bank of the river northeast of Tract No. 1. However, according to the exhibit, the channel was (in 1930) generally narrower than as shown in the survey of 1923. A small network of roads is seen in the southerly portion in the area. Aerial photographs, taken in the year 1936, show the definite narrowing of the channel and the building up of lands on either side, although the original course of the channel is yet plainly seen in the photograph and appears to have been bearing some flowage of waters. The improvements erected by plaintiffs are observable at the southern end of the area. These photographs also disclose a series of islands building up along the lower westerly side of Tract No. 1. An aerial photograph taken in 1940 shows a lessening of the intervals between the islands to the westward of Tract No. 1; and the old channel east of Tract No. 1 is much less clearly delineated. And, in an aerial photograph taken in 1953, the line of the old channel is barely perceptible. The series of islands to the westward of the tract (No. 1) are apparently joined together (Tract No. 2) and are contiguous with Tract No. 1; and there is shown a levee along the northwesterly portion of the whole contiguous area.

It is unnecessary for us to particularly examine defendant-appellant's contention that the sheriff's deed of January 25, 1930, did not convey title to Tract No. 1 to plaintiff I. E. Gaskill. Plaintiff I. E. Gaskill testified, as noted supra, that he had bought the land at sheriff's sale at the courthouse in St. Joseph for the consideration of $5,-600, and the deed delivered to him by the sheriff was introduced into evidence. The sheriff's deed recited that by judgment of the County Court of Buchanan County the tract of land in the deed described, belonging to the state, had been formed in the bed of the Missouri River in Buchanan County; that by the laws of Missouri such tract had been transferred to and was held by said county for school purposes; that the county surveyor had made a survey of the land according to law, which survey had been reported to and confirmed by the county court; that the sheriff had been directed to sell the tract at public venue to the highest bidder. The conveyance continues in reciting substantial compliance with statutory procedure required in sales of the county's public lands by a sheriff. See now again Section 241.160, supra, and, in conjunction therewith, Section 241.310, supra. It was further recited that, I. E. Gaskill being the highest bidder, the same was sold to him for the sum of $5,600. The deed recites the receipt for that sum in hand paid by I. E. Gaskill. There was substantial evidence that plaintiff I. E. Gas-

kill entered into possession, erected improvements on the (southerly) larger portion of the island, and pastured the area west of the land conveyed to the Parkinsons. It is also noted that plaintiffs ultimately reacquired whatever interest plaintiff I. E. Gaskill had conveyed to the Parkinsons in the settlement and compromise of the Parkinson litigation.

■ If, as contended by defendant-appellant, it was necessary under the provisions of Chapter 241, supra, for the county to issue a patent to a purchaser of school lands under Section 241.200 of the chapter, we, nevertheless, think the evidence shows prima facie that plaintiff I. E. Gaskill acquired the equitable title to the lands in the deed described, Tract No. 1; that is to say, there was evidence introduced which established prima facie the right of plaintiff I. E. Gaskill to the issuance of a patent by the county conveying to him the lands herein designated as Tract No. 1. And, by the very provisions of the quiet title statute, Section 527.150, supra, RSMo 1949, V.A. M.S., any person claiming any title, "whether the same be legal or equitable" may institute an action against any person or persons "having or claiming to have any title, estate or interest in such property * * *." In proceedings under Section 527.150, supra, the court determines "the title, estate and interest of the parties severally in and to such real property", and when requested "may award full and complete relief, whether legal or equitable, to the several parties * * *." The court ascertains and determines the rights of the parties under the pleadings and evidence, grants such relief as may be proper, and determines the better title, as between the parties to the proceedings, though a title superior to the rights of either may be held by a stranger. Johnson v. McAboy, 350 Mo. 1086, 169 S.W.2d 932, and cases therein cited; Meyer v. Wise, Mo.Sup., 133 S.W.2d 321. In the instant case plaintiffs claimed title against defendant, and defendant claims title as against plaintiffs. The burden of proof rested upon the respective parties to prove a better title than the other and the right to the relief asked. Johnson v. McAboy, supra; Hoffman v. Bigham, 324 Mo. 516, 24 S.W.2d 125. Plaintiffs were not required to show a title good against the whole world, but only a title superior to defendant's. Hall v. Hudgins, Mo.Sup., 277 S.W.2d 637; Deal v. Lee, Mo.Sup., 235 S.W. 1053; Felker v. Breece, 226 Mo. 320, 126 S.W. 424. The question is—which of the parties, plaintiffs or defendant, has the better title. It has been said a plaintiff "may recover on any title, however frail, which closes the mouth of the defendant." Deal v. Lee, supra [235 S.W. 1055].

■ We believe the evidence was sufficient and substantial in supporting the submission and the jury's verdict on the issue of the origin of the land including the land in controversy "as an island," or "as islands." There was substantial evidence tending to show that the high land, where the lands constituting Tract No. 1 now lie, was slowly but entirely washed away by the river; and that, later, islands formed ultimately constituting one big island, Tract No. 1; that thereafter other islands appeared and became one (Tract No. 2) now contiguous with Tract No. 1; and that by deposit of soil the channel or slough to the eastward of Tract No. 1 was filled in on either side of the line delineated by the Riddle survey. The channel or slough to the eastward of the "island," Tract No. 1, was variously stated by witnesses to be of the width of 400 to 750 feet as late as 1928; and there was evidence tending to show that boats navigated through it even after plaintiffs' purchase and entry upon and possession of the tract. The evidence which was substantial in supporting the issue of fact whether the tract including the lands in controversy arose from the bed of the Missouri River "as an island," or "as islands," also tended to negative defendant's claim of title under the law of accretions. " 'Accretions must, as a rule, in their formation preserve uninterrupted contiguity.' " Peterson v. City of St. Joseph, 348 Mo. 954, 156 S.W.2d 691, 694; De Lassus v. Faherty, 164 Mo.

361, 64 S.W. 183; Crandall v. Smith, 134 Mo. 633, 36 S.W. 612; Cooley v. Golden, 117 Mo. 33, 23 S.W. 100; Vol. 1, Farnham on Waters and Water Rights, § 69, p. 320.

The jury by its verdict found for plaintiffs and against defendant on the decisive issues of the origin of the lands constituting the three tracts including the lands in controversy, and for plaintiffs and against defendant on the issue of defendant's claim of title by adverse possession. However, defendant-appellant contends error of the trial court in instructing the jury.

 Plaintiffs' Instruction No. 6 required the jury to find that the land described in evidence as Tracts Nos. 1 and 2 was originally formed as islands or series of islands in the Missouri River which afterwards were joined together by the action of the water and soil of the river; and that Tract No. 3 "was formed by accretion onto tract number 1." The instruction directed a verdict for plaintiffs upon such finding, "provided you do not find" that lands "lying west of the Riddle survey line" formed as an accretion to defendant's land (other than that claimed by plaintiffs) ; and "provided further you do not find * * * that defendant Frances F. Cook * * *, or someone acting for and under her, has been in the adverse possession of said land, as adverse possession is defined in these instructions, for a period of ten years * * *." At plaintiffs' request the jury was instructed that the burden was on the riparian owner, defendant, to establish her claim of title by accretion; and by Instruction No. 4 that the burden was on defendant to establish title by adverse possession. The term "adverse possession" was defined in plaintiffs' Instruction No. 5.

At defendant's request the trial court defined the term "accretions," and told the jury that ownership of accretions may be acquired by adverse possession as well as by deed; advised that the burden of proving the land in controversy "formed as an island in the current of the Missouri River * * * is upon the plaintiffs, and unless

you so find your verdict must be for defendant * * *"; and defendant's Instruction G advised that Tracts Nos. 1 and 2 were not subject to sale by the county and plaintiffs acquired no title "to said formation by virtue of such a sale" unless the jury found such formation was "built up independent and apart from the shore line of said river and thereafter soil and other substances collected upon said formation and vegetation grew thereon until such formation extended above the normal level of said river * * *."

It is asserted that the trial court erroneously instructed that defendant had the burden of proving the land in controversy accreted to the shore line. It is argued that the issue of accretion was not an affirmative defense, and that under the law defendant did not have the burden of sustaining that issue. It also is contended that the trial court erred in instructing the jury that the burden of proving title by adverse possession was on defendant. It is urged that such error was especially prejudicial in that the trial court refused to give defendant's Instruction F (set out infra) on that issue. The case of Peterson v. City of St. Joseph, supra, 348 Mo. 954, 156 S.W.2d 691, is authority supporting the giving of the instruction that the burden was on the riparian owner, defendant, to establish her claim of title by accretion. It was said in the Peterson case that "defendant's claim of title was an affirmative defense comparable to the defense of adverse possession in ejectment, and the burden was on defendant to establish its claim of title." And the trial court correctly instructed that defendant had the burden of proof on the issue of adverse possession. The burden of proof as to each element of adverse possession is on the party claiming title by adverse possession. Horton v. Gentry, 357 Mo. 694, 210 S.W.2d 72.

The trial court refused defendant's Instruction F which was, as follows,

"The Court instructs the jury that one of the defenses relied upon by the

defendant Cook is that of adverse possession for a period of ten years or more to the lands in question prior to the institution of this action by plaintiffs, therefore if you find and believe from the evidence that defendant Cook and those under whom she claims have been in open, notorious, uninterrupted and exclusive and adverse possession of the lands in controversy for a period of more than ten years preceding the institution of this suit, said possession being by her, or her agents and or tenants and if you further find and believe from the evidence that defendant Cook held a deed of conveyance of said lands in controversy during such time, then it is not necessary that she cultivate, fence or otherwise tend all of said lands and if you further find she herself or by agents or tenants tended a part of the land mentioned in said deed of conveyance then you will find that she had possession to all of the lands mentioned in said deed so held by her, if you so find, and your verdict will be against the plaintiffs and in favor of the defendant Cook."

In support of the contention of error in refusing the instruction, it is argued that the instruction was proper, containing hypotheses of all of the elements of adverse possession; was supported by substantial evidence; and no other instruction submitted the issue of adverse possession "from defendant's viewpoint while Instructions Nos. 4 and 5 given at the request of plaintiffs submit that issue from plaintiffs' viewpoint." Defendant-appellant relies on those cases holding that a party defendant is entitled to an instruction on any theory supported by the evidence considered in the light most favorable to defendant. See Stoessel v. St. Louis Public Service Co., Mo.Sup., 269 S.W.2d 41; Miller v. Riss & Co., Mo.Sup., 259 S.W.2d 366; Cashion v. Meredith, 333 Mo. 970, 64 S.W.2d 670; Bashkow v. McBride, Mo.App., 177 S.W.2d 637, cited by defendant-appellant. However, error in refusing such an instruction

contemplates that the instruction was substantially correct. Schipper v. Brashear Truck Co., Mo.Sup., 132 S.W.2d 993.

■ The instruction as drafted confuses "the lands in controversy" with the "land mentioned in said deed of conveyance (from the Markts to the Graybills)." The instruction hypothesized "that defendant Cook held a deed of conveyance of said lands in controversy." Apparently, the instruction was drafted with the rule in mind that if a deed contains a description of disputed land, the deed constitutes color of title which renders such possession as the grantee may have taken of portions of the tract not unlawful and extends his possession to the whole; and "if the whole of the land embraced in the deed is a contiguous body of land, the possession of a part of the entire tract, with a claim of the whole and with the usual acts of ownership over the entire tract, established possession of the whole, a possession such as would ripen into title under the statutes of limitation." Cashion v. Meredith, supra [333 Mo. 970, 64 S.W.2d 673]. In attempting to submit this theory, the instruction, under the evidence of this case, was confusing and erroneous. Actually, defendant held no "deed of conveyance" to the lands in controversy, save and except if such lands were accreted. And there was no requirement of a finding that the lands in controversy were accretions. The instruction hypothesized that it was not necessary that defendant "cultivate, fence or otherwise tend all of said lands and if you further find that she * * * tended a part of the land *mentioned in said deed of conveyance* then you will find that she had possession to all of the lands mentioned in said deed * * *." Concededly, defendant (and her former husband) through her tenants, did possess and farm land east of the slough since the conveyance from the Markts to the Graybills. Consequently, a jury reasonably could have interpreted the instruction as authorizing a verdict for defendant on the theory that

the lands possessed, tended or farmed by defendant east of the slough extended the possession to the lands in controversy west of the slough, even though the jury believed that the land west of the slough originated as an island, and that defendant had not possessed and exercised dominion over the lands in controversy, west of the slough, for such a period of time as to acquire title thereto by adverse possession. When erroneous instructions are presented, the trial court is under no duty to correct them or modify them in any way. Schipper v. Brashear Truck Co., supra. Instructions should be clear declarations of the law applicable to the facts and if open to two or more constructions, one of which is at variance with the law, the instruction should not be given. Schipper v. Brashear Truck Co., supra; Hopkins v. Highland Dairy Farms Co., 348 Mo. 1158, 159 S.W.2d 254; Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70. We hold the trial court did not err in refusing the instruction.

It should not be urged, however, that the trial court did not recognize and instruct on the issue of adverse possession. As we have noted supra plaintiffs' principal verdict-directing instruction (No. 6) in effect required a negative finding on defendant's claim of adverse possession; and other instructions (plaintiffs' Instructions Nos. 4 and 5 and defendant's Instruction E) further advised the jury on the adverse possession issue.

■ Finally, defendant-apellant complains the verdict was improvident and not the result of deliberation upon the issue tendered in the trial of this case. She directs our attention to the facts that the trial of the case lasted into the third day; that more than fifty exhibits were introduced into evidence; that the trial court gave sixteen instructions; and that the jury returned a verdict in approximately twelve minutes after the submission. It is her position that the "hasty" verdict demonstrates beyond legitimate dispute "that the

jury did not obey the instructions of the court and give the issues the serious consideration the law expects and to which defendant was entitled."

It is true that the transcript on appeal is voluminous and that evidence was in conflict on the factual issues presented. We endorse the view that a verdict should be the result of dispassionate consideration, and conscientious reflection, and jurors should, if necessary, deliberate patiently and long on the issues which have been submitted to them. 89 C.J.S. Trial § 462c, p. 93. However, the submitted issues in this case were clearly drawn and, although numerous witnesses testified and, as stated, there were many exhibits, we cannot surely say the jury did not understand the issues and did not conscientiously weigh and evaluate the evidence. The transcript also shows that the trial judge read the given instructions to the jury, and that counsel argued the cause. Defendant-appellant's instant contention was assigned in her motion for a new trial. We have no doubt the trial court considered the assignment; and, in directing the entry of the order overruling the motion, the trial judge indicated his belief that the time, during which the jury considered upon the verdict, was not indicatory of the jurors' disregard of their duty to return a verdict the result of conscientious reflection and good judgment. We think we should not say that the fact alone that a jury returned a prompt or even a "speedy" verdict demonstrates prejudice on the part of the jurors, or that the verdict was "improvident" and not the result of adequate and serious consideration of the evidence and the applicable law as defined in the instructions. See Beach v. Commonwealth, Ky., 246 S.W.2d 587, a homicide case—the jury returned a verdict in about eight minutes after the case was submitted; and O'Connell v. Ford, 58 R.I. 111, 191 A. 501, a wrongful death case—the jury returned a verdict within ten minutes after retiring to the jury room. The contention is ruled adversely to defendant-appellant.

The jury having found for plaintiffs and against defendant on the decisive factual issues, and no error committed by the trial court against defendant materially affecting the merits of the cause having been demonstrated, the judgment and decree of the trial court should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.