**HAMBURG REALTY COMPANY, a Corporation, Appellant,**

v.

**Fred WALKER, Gertrude Walker, Cecil P. Walker, Olin Engleman and Maye Engleman, Respondents,**

**F. Pace Woods, Olive Black Woods and Lucian Smith, Defendants.**

No. 47126–A.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Rehearing Denied Sept. 14, 1959.

M. E. Ford, Maryville, J. M. Gerlash, Tarkio, for appellant.

John Redd, Sidney, Iowa, Walter L. Mulvania, Rock Port, for respondents.

HOLLINGSWORTH, Judge.

Plaintiff, a corporation, brought this action to quiet its alleged fee simple record title to certain island lands which formed in the Missouri River immediately south of the Iowa-Missouri line in Atchison County, Missouri. By agreement of all of the parties, the issue of title to a portion of the lands described in plaintiff's petition was tried to a jury, resulting in a verdict and final judgment declaring the respondents Fred Walker, Gertrude Walker, Cecil P. Walker, Olin Engleman and Maye Engleman to be the fee simple owners of said portion of said lands by virtue of adverse possession thereof for more than ten years, as defined in Section 516.010 RSMo 1949, V.A.M.S. Plaintiff has appealed.

The history of the entire area of the land to which plaintiff asserts title and the pleadings in relation thereto are set forth in Hamburg Realty Co. v. F. Pace Woods, Mo., 327 S.W.2d 138, handed down concurrently with this opinion. The land involved in this appeal consists of 253.6 acres on the Missouri side of an island known as the Walker-Engleman Island, which island lies partly in Missouri and partly in Iowa.

Plaintiff assigns error in the refusal of the court to sustain its motion for a directed verdict filed at the close of all of the evidence and in the giving of two instructions in behalf of defendants. Plaintiff's evidence consisted solely of its deed from Atchison County, dated June 6, 1950, to the lands claimed by it, a subsequent deed of correction of its original deed, the receipts for state and county taxes paid by plaintiff on said lands for the years 1951 through 1957, and the oral testimony of a witness who pointed out on a map the location and outlines of the island. Consequently, in determining the sufficiency of the evidence to support the verdict and judgment involved in the instant appeal, we have for consideration only the evidence adduced by defendants on the issue of adverse possession, which, in substance, follows:

On September 14, 1930, defendant Cecil P. Walker and his father-in-law, Al Engleman, came to the island, bringing with them a bed and bedding, chairs, stove, tent and axes. Upon arrival they constructed a dugout, in which they lived during the ensuing winter. The low lands on the island were partially covered with willows and cottonwood trees grew on the higher land. During the first winter, Cecil and Al cleared a small area around the dugout. In the

spring of 1931, they brought horses and a plow, did some plowing and more clearing, built two willow houses for the occupancy of themselves and their respective families, one on the Missouri side and one on the Iowa side, sowed sweet clover around through the willows for the purpose of enriching the land and the growth of pasture areas wherever the clover would grow. They sowed 500 pounds of such seed in 1931 and 1932 and continued to sow sweet clover about every year thereafter, reseeding wherever the growing clover was drowned out. They put up "no trespassing" signs at the river bank on all sides of the island, which they thereafter continuously maintained. In 1932, they built a log house, into which Cecil and his wife and children moved. Later that same year (it seems) a two-room house with a gabled roof was built, in which Al and his wife lived.

The clearing, which they had begun in 1931, continued throughout the ensuing years. The progress was slow at first, but later it averaged ten acres per year. As the clearing progressed, they began general farming and cropping operations, which increased apace with the clearing. In February, 1933, they purchased and brought to the island a Fordson tractor, a disc, lister, cultivator, hayrake and a plow. The farming equipment was thereafter operated partly with teams of horses and partly with the tractor. They bought and traded for more horses until in some years they used as many as six different teams. In 1932, they brought two cows to the island and their herd gradually increased until at times there were twenty-one of them. In the same year, they brought two sows over, one of which farrowed; and hogs were thereafter on the island, except for one or two years. They also pastured at various times as many as fourteen horses and fifty head of cattle for other persons. The livestock had free run of the island, except as to the areas in crops. Numerous places on the island were used to "fence-off" the livestock from the crops. After the crops were harvested, the livestock would be released to range the entire island. In 1939, a Massey-Harris tractor was purchased and it and the Fordson were used for clearing, planting, cultivating and harvesting. The crops grown on the island, other than sweet clover, were mostly corn, alfalfa and potatoes. In 1935, they cut several barge loads of willows from the island for a construction company, hauling them from the various places on the island at which they were cut to barges placed along the island bank. They also raised poultry and made gardens at each of their homes.

Cecil Walker and his wife lived on and devoted their energies to development of the island until 1936, at which time they returned to Nebraska. Their son, Fred Walker, and Al Engleman and his wife remained and lived on the island pursuant to an "arrangement" with his father and Al. Fred and Al "just went ahead making a farm out of it." Cecil never lived on the island thereafter, but he returned occasionally. Cecil and Al had an agreement with reference to the island and the farming operations but, over objection of plaintiff, Cecil was not permitted to testify as to its terms. Cecil did testify, however, that each (probably, Fred was acting in behalf of Cecil) did his share of the work in "every way", Al having a half interest in the crops, but no interest in the livestock.

Tax receipts showed that on November 2, 1936, Cecil and Al paid all taxes assessed against the land for the years of 1930 through 1935; that on November 4, 1936, they paid the 1936 taxes; that on December 20, 1937, they paid the 1937 taxes; that on October 9, 1940, they paid the 1938 taxes; and that on October 9, 1945, they paid all taxes from 1940 through 1945. It is said that the receipt for the 1939 taxes was lost. After Cecil and Al came to the island, it became and was publicly known and referred to locally and in the county seat as the Walker-Engleman Island.

From time to time prior to 1940, the island would overflow to such an extent that the families would be forced tempo-

rarily to leave their homes for short periods of time. In 1940, 1200 bushels of corn were grown on the island. In the spring of 1942, one hundred acres had been cleared and Fred Walker obtained an F.H.A. loan to enable him to carry on the farming operations. However, a flood came that year, which covered practically the whole island, forcing all of them to move off. Intending to return when the flood receded, they left all of their househould goods and farming equipment on the island, with the exception of one tractor.

Fred came to the island in the spring of 1943 and discovered that the home and farming equipment were still usable. But another flood came that year, followed by another "good one" in 1944. After 1942, nothing was done on the farm except that the Walkers "kept tab" on it to see that no squatters came to it. One of the houses and all of the farm machinery remained in fair condition until the flood of 1952. The house collapsed during that flood. Apparently, nothing was done in the way of rehabilitating the premises after the defendants left them in 1942 until 1955, when Fred Walker took a trailer house in which to live and an Oliver tractor to the island. In February, 1958, a bulldozer was taken over there and about twenty acres had been cleared at trial time.

Al Engleman died intestate in 1951. His wife died in 1956. His heirs are the defendants Olin Engleman, Maye Engleman and Gertrude Walker. No one, except plaintiff, in so far as any of the witnesses ever knew, has ever claimed any title to the land since the Walkers and Al Engleman came there, other than these defendants and Al Engleman; and no one, except Cecil and Al and their families, has lived upon or been in possession of the island or any portion of it since Cecil and Al came there in 1930.

Plaintiff contends that there was no showing on the part of defendants that Cecil P. Walker or Al Engleman had or claimed to have either color of title or claim of right to the land in controversy at the time they settled thereon, which, plaintiff asserts, was essential to adverse possesion; and that defendants were mere squatters.

■ Title to the lands here involved was originally vested in Atchison County under the provisions of Chapter 241, RSMo 1949, V.A.M.S., relating to "Swamp Lands, Islands and Abandoned River Beds." The ten-year statute of limitations, § 516.010, supra, runs against the county so as to deprive it of its title to such lands. Reynolds v. Ellison, Mo., 225 S.W. 948, 949. The essential elements of adverse possession, as contemplated by the statute, are: (1) the possession must be hostile, that is, under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous. State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176; Grimes v. Armstrong, Mo., 304 S.W.2d 793, 799; Krumm v. Streiler, Mo., 313 S.W.2d 680, 686. But, it is not necessary that an adverse claimant have color of title to land actually possessed in order to invoke the provisions of Section 516.010, supra. Color of title is necessary only when the adverse claimant, in actual possession of part of the land, seeks to draw to that part the whole of the land claimed. Peterson v. Harpst, Mo., 247 S.W.2d 663, 666. And, while actual possession of the whole of lands adversely claimed, without color of title, does not necessarily establish sufficient hostility of possession of the whole, it is sufficient if the possessor actually occupies the whole of the land in question, intending to occupy it as his own. Possession is a legal concept. As to one in actual possession, "it involves two things: A present * * * ability to control the thing possessed plus an intent to exclude others from such control. Or, in the language sometimes used in the cases, to exercise dominion over the object possessed. One may have such an intent in the case of property actually belonging to another, because he intentionally wants to take it away from the owner." State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W. 2d 174, 177; Mooney v. Canter, Mo., 311

S.W.2d 1, 5. "The real question is: What was his claim? and not: Why did he make it?" Bell v. Barrett, Mo., 76 S.W.2d 394, 397.

It is unnecessary to review the evidence above set forth. It is brief and speaks for itself. We are convinced that it would support a finding of the jury that Cecil P. Walker and Al Engleman came to the island in 1930 (during the period of bitter depression) with the intention of establishing their homes on the island and, as joint venturers, to occupy, possess and develop the whole of the island as co-owners thereof; and that, so intending, they thenceforth openly claimed ownership of the entire island as against all others and were in actual, open and notorious, exclusive and continuous possession of the whole island for a period of more than ten years following their entry, to wit: from September 14, 1930, until sometime in 1942. See City of Kirksville v. Young, Mo., 252 S.W.2d 286. And, of course, once title becomes vested in that manner, it would so remain until it passed by grant or operation of law. as other titles are transferred. Fugate v. Pierce, 49 Mo. 441; Constant v. Almus, Mo., 281 S.W. 26, 29.

Plaintiff contends that the court erred in giving instruction D-8 in behalf of defendants. That instruction declares, in the first paragraph thereof: "The court instructs the jury that the burden of proof is on the plaintiff to establish by the preponderance or greater weight of the evidence the facts necessary to a verdict in its favor under these instructions." On the other hand, the court gave instruction 7 in behalf of plaintiff, declaring: "The court instructs the jury that the burden of proof rests upon the defendants to prove adverse possession as defined in other instructions, and unless such defense is established by a preponderance of evidence, the jury will find for plaintiff as to such issue." Instruction 7, given in behalf of plaintiff, was unquestionably correct. Franck Bros., Inc. v. Rose, Mo., 301 S.W.2d 806, 811; Grimes

v. Armstrong, Mo., 304 S.W.2d 793, 799; Krumm v. Streiler, Mo., 313 S.W.2d 680, 686; Gaskill v. Cook, Mo., 315 S.W.2d 747, 755. Instruction D-8 was therefore, unquestionably erroneous. The two instructions were directly in conflict and we cannot know to which of them the jury gave heed.

The sole issue submitted to the jury, upon which title to the land in controversy could lawfully be adjudged in defendants, was that of title by adverse possession. As stated, the burden of proving every element of adverse possession rested upon defendants. Instruction D-8 not only relieved defendants of that burden but it placed upon plaintiff the burden of proving that defendants had not acquired title by adverse possession before any verdict could be returned in favor of plaintiff. The verdict in this case hinges squarely upon the credibility of the testimony of defendants' witnesses. The jury may have entertained doubt of the credibility of vital portions of their testimony, but it was confronted with an instruction that placed upon plaintiff the burden of showing that defendants had not acquired title by adverse possession before plaintiff was entitled to a verdict in its favor. It was, therefore, essential that the jury be not misled or left in doubt upon which of the parties was cast the burden of proof on the issue of adverse possession. We must hold that instruction D-8 was prejudicially erroneous, necessitating reversal and remand.

Plaintiff next contends that the court erred in giving defendants' verdict-directing instruction D-9. That instruction, after hypothesizing the evidence relating to the elements of adverse possession, then directs a verdict for defendants if the jury finds that defendants so adversely possessed the land for a "period of ten consecutive years *at some time prior to the filing of plaintiff's petition on the 12th day of March, 1957.*" (Emphasis supplied.) We think there was not sufficient showing of actual,

open, notorious and continuous adverse possession, subsequent to the removal of defendants from the island in 1942, of such character as to warrant its being tacked to any unexpired portion of the required ten years. In other words, although we have held that the testimony would support a finding that defendants' adverse possession began when Cecil and Al came to the island in 1930, yet it is entirely possible that the jury may have believed they were at first mere squatters and actually did not assert ownership until they began to pay state and county taxes in 1936; or, for that matter, until some other subsequent or even prior date, insufficient in point of time to admit of a finding that they had been in actual, open, notorious and continuous possession under claim of ownership for a period of ten years prior to the time they left the island in 1942. Upon retrial, the time limits within which the evidence would support a finding of ten years of continuous adverse possession may be submitted, as the evidence may warrant.

The judgment is reversed and the cause remanded.

All concur.